1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

TODD D. PICKENS,                    )    No. C 05-2130 JF (PR)
                                    )
                  Petitioner,       )    ORDER DENYING PETITION
                                    )    FOR WRIT OF HABEAS
     vs.                            )    CORPUS
                                    )
BEN CURRY, Warden                   )
                                    )
                  Respondent.       )
_____   )

        Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254 challenging his conviction for three counts of robbery. (Cal. Penal Code § 211).

This Court found that the operative second amended petition stated cognizable claims and

ordered Respondent[1] to show cause as to why the petition should not be granted.  Respondent

filed an answer addressing the merits of the petition, and Petitioner has filed a traverse.

Thereafter, Petitioner filed a supplemental traverse with additional documentation and points and

authorities.  After reviewing the papers and the underlying record, the Court concludes that

Petitioner is not entitled to relief based on the claims presented and will deny the petition.

---

        [1]The proper named respondent in this action is Ben Curry, the acting Warden at the
Correctional Training Facility in Soledad, where petitioner is incarcerated.  Stanley v. Cal.
Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) (holding that the warden where petitioner is
incarcerated is the proper respondent); Rule 2(a), 28 U.S.C. § 2254.

## I. INTRODUCTION

An Alameda Superior Court jury convicted Petitioner of three counts of robbery in August 2001. On September 21, 2001, Petitioner was sentenced to a term of eighteen years in state prison. Petitioner appealed the judgment and conviction. On November 19, 2003, the appellate court affirmed the judgment. On February 18, 2004, the state supreme court denied a petition for review. Two state habeas petitions were denied by the state supreme court on June 8, 2005. The instant federal habeas action was filed on May 24, 2005; the second amended petition was filed on November 3, 2005.

### A.    Factual Background[2]

The relevant facts are set forth by the California Court of Appeal as follows:

> Appellant was tried for three robbery incidents involving four victims: Cassandra Angel (count one); Bruce Babst and Emily Grimm (counts two and three, respectively), and Dawn Roe (count four). Appellant was convicted only of the Babst, Grimm, and Roe robberies. As to the Angel robbery, the jury was unable to reach a verdict; nonetheless, we discuss the evidence regarding it, because it is relevant to appellant's contention that the various counts should have been tried separately.

### 1.    Angel Robbery (Count One)

> On October 2, 1999,[3] around 5:30 a.m., Cassandra Angel was alone at her workplace, the Hudson Bay Cafe, preparing to open for business. The cafe is located on College Avenue in Oakland, about three blocks from the Rockridge BART station. As she was setting up tables on the sidewalk outside the cafe, a man approached within three or four feet of her and said "Give me the money." The man was an African-American with a dark complexion and no facial hair, was a little over six feet tall, and looked about 23 to 25 years old. He was wearing a somewhat puffy blue down jacket with a hood that came almost down to his eyebrows, so Angel could not see whether he had any hair, and it was hard for her to tell how much he weighed, though she estimated about 175 to 180 pounds. The man kept his right hand in his coat pocket, and Angel was concerned that he might have a weapon, though he never said he had a gun or made any threats.

> When Angel explained that the cafe's money had not arrived yet, the man asked for her personal money. She went to retrieve it, and he followed her inside the café. Angel gave the man the few dollars she had in her bag, and he left. The entire incident took about three or four minutes, and it was still dark out at the time. As soon as the man left, Angel closed the café and called the police to tell them she had been robbed.

---

[2] The relevant facts are elicited from the unpublished opinion of the California Court of Appeal, First Appellate District, Division 2, People v. Pickens, Case No. A096385, (Nov. 19, 2003) at 1-10 (Respondent's Answer, Ex. C).

[3] All further references to dates are to the year 1999 unless otherwise specified.

On October 7, Angel was asked to view a lineup at the Oakland Police Department. She was shown about five or six men wearing a blue jacket that looked like the one worn by the man who robbed her, and she identified appellant as the perpetrator of the October 2 robbery.[4] Most of the people in the lineup had facial hair, but Angel recalled, and had told the officer who took her statement right after the robbery, that the robber did not have any facial hair.

At trial, Angel testified that she was "probably 99" percent sure that appellant was the man who robbed her, but not 100 percent. She also said that a blue jacket introduced in evidence by the prosecution looked like the one the robber had been wearing.[5]

## 2.   Babst and Grimm Robberies (Counts Two and Three)

At dusk on October 2, the same day Angel was robbed, and also in the Rockridge district of Oakland, Emily Grimm and her boyfriend Bruce Babst returned to Grimm's home from grocery shopping, and parked Grimm's car on Ada Street near Broadway, in an area lit by a streetlight. Babst bent over into the interior of the car to retrieve the groceries from the floor, while Grimm stood in the street near the back corner of the driver's side of the car. Grimm saw a fairly thin, dark-complexioned, clean-shaven Black man, over six feet tall, with a long face and high cheekbones, crossing Ada Street towards her, wearing a bulky dark blue jacket with the hood pulled up over his head almost down to his eyebrows, so that his hair and forehead were not visible. The man's hands were out of sight under the jacket, making it bulge.[6]

The man walked directly towards Grimm and then stopped a couple of feet in front of her, leading her to think that he was going to ask her for directions or change, so she spoke to him. The man responded, "You can make it easy or you can make it hard. Give me your money, or I'll shoot you in the face." At that point, Grimm felt she was being threatened, and became concerned that the bulge in the man's jacket might be a weapon. Grimm handed the man her wallet, which contained only a few dollars in cash, but also had her credit cards, bank cards, and driver's license.

Babst, who had not been visible when the man approached, then emerged from the car and tried to determine what was happening. The man said "Give me your money" or "Give me the money"; Grimm told Babst to give the man his wallet; and Babst then understood that he and Grimm were being robbed. Before handing his wallet to the man, Babst asked if he could remove his driver's license. The man agreed, so Babst removed his driver's license and bank card from his wallet before handing it over. Grimm then asked if she could have her driver's license back as well, and the man handed it to her. The man immediately walked back in the direction from which he had come, and Grimm and Babst went to her home and called the police. The police took a fingerprint from Grimm's driver's license, but it did not match appellant's, and Grimm explained at trial that other people frequently handled her driver's license.

---

[4] Angel also identified appellant at the preliminary hearing.

[5] The blue jacket used at the lineup, and introduced as evidence at trial, was taken from the car appellant was driving when he was arrested shortly after the Roe robbery.

[6] Babst also described the man as being over six feet tall, clean-shaven, having a long face and high cheekbones, weighing over 155 pounds but not heavy, wearing a blue jacket with the hood pulled up, and having his hands in his jacket pockets. Babst testified, however, that the jacket's hood came down only to the middle of the man's forehead.

1

2           A few days later, Grimm and Babst went to the police department to view a
lineup.  Appellant had a "peach fuzz" mustache at the time of the lineup, and Grimm had
described the robber as clean-shaven.  Nonetheless, Grimm identified appellant at the

3   lineup as the man who had robbed her, as she also did at the preliminary hearing and at
trial.[7]  Grimm testified at trial that during the lineup, "it was just really obvious that that

4   was him"; that she was "very positive that he was the person who robbed me"; that she
had had a "visceral reaction" when he appeared and had "very strongly recognized" him;

5   and that she had recognized his voice and the way he walked.  Grimm also testified that
the jacket used in the lineup, and introduced in evidence at trial, matched the jacket worn

6   by the robber, which she remembered clearly because she had liked the material it was
made from.  On cross-examination, Grimm reiterated that she had "as much certainty as I

7   can say about anything in my life" that appellant was the robber, though she declined to
quantify her degree of certainty as being 100 percent, explaining "that's not a phrase that I

8   would say."

9           Babst did not identify anyone as the robber at the lineup, but identified appellant
both at the preliminary hearing and at trial.  He testified at trial that he had recognized

10  appellant as the robber at the lineup, and was certain of the identification once he heard
appellant's voice; he explained that had not marked his lineup card because he was trying

11  to avoid being subpoenaed as a witness later on, and admitted that he had "shirked my
responsibility by not indicating anyone"[8] from the lineup.  When asked on

12  cross-examination whether his identification of appellant was 100 percent positive, Babst
asked rhetorically "Is anything 100 percent[?]" but then added, "Yeah, I guess I can."

13  Like Grimm, Babst identified the jacket introduced in evidence at trial as looking like the
one worn by the robber.

14  **3.      Roe Robbery (Count Four)**

15          About 7:00 a.m. on October 7, five days after the Angel and Grimm/Babst
robberies, Dawn Roe was walking along the left side of McMillan Street toward Keith,

16  heading for the bus stop at the Rockridge BART station, when a car passed her, going in
the same direction she was walking.  The car drew Roe's attention, because vehicle traffic

17  was unusual at that time of the morning, and the car was moving abnormally slowly.
        Shortly after the car turned right onto Keith Street, Roe noticed a man whom she

18  did not recognize walking toward her on the opposite side of McMillan.  The man was a
thin African-American, over six feet tall, with a dark complexion, an oval face, and a

19  shaved head, wearing a dark blue hooded jacket.  Roe did not remember him as having
any facial hair.

20

21

22

23     [7]Grimm had given inconsistent estimates of the robber's age, but she explained at trial
that this was due to her general tendency to be a bad judge of people's ages.

24
       [8]At the preliminary hearing, Babst gave a somewhat different reason for not having

25  marked his card at the lineup, i.e., that he did not "like to point the finger at people" and that "[i]t
made [him] uncomfortable to identify someone."  He was unequivocal, however, that appellant

26  had been the only person at the lineup who resembled the robber.  We do not perceive any
irreconcilable inconsistency between Babst's varying explanations of his decision not to mark the

27  lineup card, nor do we view his failure to disclose his recognition of appellant at the time of the
lineup as fatally undermining the credibility or accuracy of his subsequent identification

28  testimony.

Order Denying Petition for Writ of Habeas Corpus
P:\pro-se\sj.jf\hc.05\Pickens130den                    4

Roe briefly made eye contact with the man, and he cut across the street towards her, pulling up the hood on his jacket. As Roe passed the man, she heard him say something to her that she did not understand. Eventually, she stopped, realizing that he was saying, "I don't want to hurt you. Give me your money." When Roe refused, the man gestured toward a nearby carport and said, "Get over there." The man was holding his hand in his jacket pocket in a way that made Roe concerned that he had a gun,[9] so she dropped the bags she was carrying and said, "No, I'll give you whatever you want." With the robber standing over Roe and telling her to hurry, she crouched down and retrieved just over $280 from one of her bags, consisting of one $100 bill, several $20 bills, and a few smaller bills.[10] The robber took the money and walked away in the direction from which he had come.

As Roe watched the robber walk away, she saw another person coming past the robber towards her, walking a dog. The dog walker was a man named Mark Sherstinsky. Sherstinsky testified at trial that just before he saw Roe that day, he had passed a tall Black man with a dark complexion and a shaved head, wearing a dark puffy jacket, walking in the opposite direction.[11]

Roe came running up to Sherstinsky, told him she had been robbed, asked him for help, and then ran around the corner of Keith and McMillan streets in pursuit of the robber, with Sherstinsky following behind. As she turned the corner, Roe saw the robber get into the driver's side of a car parked on Keith Street, with a license plate number beginning with either 1PT or IPT, and containing the number 100. It was the same car that had driven past Roe just prior to the robbery. Sherstinsky also saw the car pull away from the curb and speed off. He described it as a big brown "late 70s" American car, long and boxy in body style. After the car drove away, Sherstinsky accompanied Roe to a nearby grocery store, where she called the police and gave them the license plate number and a description of the robber and the car.

The car's description and the partial license plate number went out over the police radio, and shortly thereafter, around 8:00 a.m., an Oakland police officer spotted a brown Buick not far from the site of the robbery, and followed it for several blocks until he could read the license plate number. About when the officer got close enough to read the license plate number, which was 1PTS100, the car pulled over to the curb and stopped.

---

[9]When Roe called the police later, she told them the robber had a gun. She explained at trial that she had not actually seen a gun, but had assumed the man had one based on the way he gestured with his hand in his pocket.

[10]Roe, who was a schoolteacher, was carrying an unusual amount of cash that day because she was planning to buy supplies for her classroom after work. At the preliminary hearing, Roe testified that the money she had been carrying had all been $20 bills, but she explained at trial that since the preliminary hearing, she had reviewed her contemporaneous notes indicating that the cash had included a $100 bill, and this refreshed her recollection.

[11]Sherstinsky only saw the man for a few seconds, and was unable to identify him when he looked at photographs of a subsequent lineup. At trial, he testified that appellant "resemble[d]" the man. Sherstinsky's trial testimony regarding the man's build was inconsistent with the statement he had given the police at the time.

The police subsequently arrested the driver (appellant) and passenger (Henry Lindsey).[12]

The police officers who were involved in appellant's arrest and the ensuing investigation found a dark blue, hooded jacket on the back seat of the car.  At trial, Roe and Sherstinsky, like the other robbery victims, identified the blue jacket found in the car as the one worn by the robber.  On the driver's seat of the car, the police found $208 in cash, consisting of one $100 bill, five $20 bills, one $5 bill, and three $1 bills, as well as a knife located next to the driver's seat.

When appellant's car was stopped, Roe was still at the grocery store, talking to the police who had responded to her call.  They asked Roe to come and look at someone who might or might not be the person who robbed her, and drove her to the location where appellant's car had been pulled over.  Once there, Roe identified appellant as the man who had robbed her, although he was dressed in different clothes.  After Roe identified appellant, the police had him put on the blue jacket they had found in the car, and also showed Roe a second African-American man with a shaved head, who also put on the blue jacket.  Roe was sure that appellant, not the other man, was the robber.  She also recognized the car as the one in which the robber had left the scene, although she had paid more attention to getting its license plate number than to its physical appearance.  Sherstinsky also testified that a photograph of this car looked like the car he saw pulling away after the robbery.  Roe identified appellant as the robber with "100 percent certainty" at trial, and recognized his voice.

Later the same day, Oakland Police Sergeant Brian Medeiros, together with another officer, Sergeant Beal, interviewed appellant at the Oakland police station.  Medeiros's trial testimony related the interview as follows.[13]  Appellant told Medeiros that he lived with his mother, Audrey Cobb, on 46th Street in Oakland, and that he was employed as a caterer.  Medeiros obtained a waiver of appellant's Miranda rights, and then asked him if he had been involved in the Roe robbery.  Appellant repeatedly denied it, and explained that he had stayed with Denise Hines in Hayward the previous night and had left for Oakland between 6:30 and 7:00 a.m.  Appellant acknowledged to Medeiros that he had some debts, but explained that he had inherited some $40,000 from his father, though his mother had control of it and he could not access it without her approval.  He said that the blue jacket found in the back of the car had belonged to his deceased brother.

After interviewing appellant for about 40 minutes, Medeiros checked appellant's wallet for credit cards or identification belonging to the robbery victims, and found what he suspected (correctly, as later testing revealed) was three rocks of cocaine.  Medeiros testified at trial that appellant responded by acknowledging that "I have a problem."[14]

---

[12]The name is spelled phonetically as "Linzie" in some portions of the transcript, but in those instances, the prosecutor's questions identify "Linzie" as the person appellant was arrested with on October 7, 1999, so we understand those references to be to the same person, i.e., Henry Lindsey.

[13]As will appear, post, [Petitioner's] version of the conversation was markedly different from that of Medeiros; he denied answering any of the officers' questions or giving them any information.

[14]At a pretrial motion on December 18, 2000, Medeiros testified that upon the discovery of the cocaine, it was he or his colleague Sergeant Beal, rather than appellant, who "stated [that] you [appellant] have a problem."

1    Medeiros then left the interview room to mark the cocaine for later use as evidence.[15]

2         When Medeiros returned a little less than an hour later, appellant admitted that he
     had walked up to a White female earlier that day and asked her for her money, because he
3    needed money for gas.  Appellant also admitted having drug debts, using cocaine, and
     being responsible for three other robberies, one of which was committed in Oakland near
4    the Safeway store, and one outside Oakland.  Appellant then terminated the interview,
     and the investigating officers proceeded to arrange the lineup that Angel, Grimm, and
5    Babst were asked to attend later that day.

6    **4.    Defense Case**

7         Before testifying on his own behalf, appellant presented the testimony of his
     fiancée, Denise Hines; his mother, Audrey Cobb; and his former girlfriend, Latricia King,
8    to corroborate his contention that he had no motive for the robberies because he had
     income from a catering business as well as access to a substantial sum of money his
9    father had left him.  King also provided conceitedly weak corroboration of appellant's
     alibi for the Roe robbery.  The testimony of Hines and King is discussed in more detail
10   below, in connection with appellant's contention that the trial judge erred in allowing the
     prosecutor to cross-examine them improperly.

11
         Appellant testified that he had not committed any of the robberies.  He explained
12   that he had access to a substantial amount of money that his mother kept for him, some of
     which he had withdrawn from the bank around the time of the robberies, and therefore
13   that he had no need to commit robbery in order to obtain funds.  He discussed his work as
     a cook, and his efforts to start up a catering business.  He asserted that he had been at
14   King's home during the time the Roe robbery occurred; that the cash found on him at the
     time of his arrest came from his own bank account, and that he had obtained the $100 bill
15   from the girlfriend of his co-arrestee, Henry Lindsey, who asked him to break it for her.

16       In response to the prosecutor's questions on cross-examination, appellant stated
     that he had stopped using crack cocaine some months before the robberies, and
17   disclaimed ownership, and even knowledge, of the crack cocaine found in his wallet
     when he was arrested.  He denied telling Sergeant Medeiros that he had a problem with
18   crack cocaine.  He contended that he had never seen the blue jacket until the morning of
     October 7, when it was placed on him after his arrest, and denied telling the investigating
19   officers that it had belonged to his brother.  He contended that after Sergeant Medeiros
     read him his Miranda rights, he declined to answer any of his or Sergeant Beal's
20   questions.  He denied saying any of the things attributed to him by Sergeants Medeiros
     and Beal, and said that he did not know where they obtained the information reflected in
21   their notes.

22   ///

23   ///

24   ///

25   ///

26   ///

27

28       [15]Appellant was also criminally charged for cocaine possession, but those charges were
     severed and are not at issue on this appeal.

1                                             **II. DISCUSSION**

2   **A.**      **Standard of Review**

3          This petition was filed after April 24, 1996, and, therefore, is governed by the

4  Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant

5  restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court

6  may not grant habeas relief with respect to a state court proceeding unless the state court's ruling

7  was "contrary to, or an involved an unreasonable application of, clearly established federal law,

8  as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was

9  based on an unreasonable determination of the facts in light of the evidence presented in the state

10  court proceeding."  28 U.S.C. § 2254(d)(2).

11         "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

12  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

13  the state court decides a case differently than [the] Court has on a set of materially

14  indistinguishable facts."  <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 413 (2000).  "Under the

15  'unreasonable application clause,' a federal habeas court may grant the writ if the state court

16  identifies the correct governing legal principle from [the] Court's decisions but unreasonably

17  applies that principle to the facts of the prisoner's case."  <u>Id.</u>  "[A] federal habeas court may not

18  issue the writ simply because the court concludes in its independent judgment that the relevant

19  state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

20  that application must also be unreasonable."  <u>Id.</u> at 411.

21         "[A] federal habeas court making the 'unreasonable application' inquiry should ask

22  whether the state court's application of clearly established federal law was 'objectively

23  unreasonable.'"  <u>Id.</u> at 409.  In examining whether the state court decision was objectively

24  unreasonable, the inquiry may require analysis of the state court's method as well as its result.

25  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable" standard

26  does not equate to "clear error" because "[t]hese two standards . . . are not the same.  The gloss

27  of clear error fails to give proper deference to state courts by conflating error (even clear error)

28  with unreasonableness."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003).

1   A federal habeas court may grant the writ if it concludes that the state court's adjudication

2   of the claim "resulted in a decision that was based on an unreasonable determination of the facts

3   in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).  The

4   court must presume correct any determination of a factual issue made by a state court unless the

5   Petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. §

6   2254(e)(1).

7       A summary denial of a claim by the highest state court is considered a denial "on the

8   merits," and is presumed to rest on grounds articulated by a lower court in its written opinion.

9   Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Hunter v. Aispuro, 982 F.2d 344, 347-348 (9th

10  Cir.1992), cert. denied, 510 U.S. 887 (1993).  A reviewing court may then "look through" the

11  unexplained summary denial, and apply the deferential standard of 28 U.S.C. 2254(d), to the

12  lower state court's reasoned decision.

13  **B.    Analysis**

14      1.     The State Court's Rejection of Petitioner's Prosecutorial Misconduct Claim Was
             Not Objectively Unreasonable
15

16      Petitioner claims that the prosecutor committed misconduct by improperly eliciting

17  Petitioner's opinion as to whether the testimony of several witnesses at trial was true.  Petition at

18  6A.  Specifically, the prosecutor asked Petitioner during cross-examination whether Petitioner

19  believed a previous witness was lying, thus pointing out the inconsistencies between Petitioner's

20  testimony and the testimony of the witness.  Resp. Ex. C at 27-28.  The prosecutor asked

21  Petitioner whether Petitioner's fiancee lied when she testified that Petitioner had a key to her

22  house.  Id.  The prosecutor also asked Petitioner whether the witnesses who identified Petitioner

23  at the photo lineup were lying, and whether Officer Medeiros was lying when he testified to the

24  events surrounding Petitioner's interrogation.  Id.  Defense counsel objected to the prosecutor's

25  first question regarding the testimony of Petitioner's fiancee.  However, during a conference in

26  chambers, defense counsel "conceded that it was appropriate for the prosecutor to confront

27  [Petitioner] with the inconsistencies between his testimony and that of other witnesses, but

28  contended that it was misconduct for the prosecutor to ask [Petitioner] to speculate on the

1   veracity of other witnesses." Id.  When the cross examination continued, "the prosecutor asked

2   [Petitioner] whether the other witness had been lying or telling the truth..." but defense counsel's

3   objection was overruled.  Petitioner then answered that he did not know.  Id.  Petitioner

4   responded to the prosecutor's similar questions in the same manner or by restating his former

5   testimony.  Id.

6       A claim of prosecutorial misconduct is cognizable on federal habeas corpus.  The

7   appropriate standard of review is the narrow one of due process and not the broad exercise of

8   supervisory power.  See Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due

9   process rights are violated when a prosecutor's misconduct renders a trial "fundamentally

10  unfair."  See id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process

11  analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability

12  of the prosecutor").  Under Darden, the first issue is whether the prosecutor's remarks were

13  improper; if so, the next question is whether such conduct infected the trial with unfairness.  Tan

14  v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided

15  "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks

16  so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

17  Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (quoting Stovall v. Denno, 388 U.S. 293,

18  301-02 (1967), cert. denied, 516 U.S. 1017 (1995)).  Therefore, the proper focus is not on the

19  conduct of the prosecutor, but whether the trial was fair.  Smith, 455 U.S. at 219.

20      Improper questioning of a witness by the prosecutor is not sufficient by itself to warrant

21  reversal.  In considering whether the questioning deprived the defendant of a fair trial, the

22  witness's testimony should be viewed as a whole to determine the impact of the improper

23  questioning.  Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998) (prosecutor questioning witness

24  as to whether she was afraid of defendant did not render the proceedings fundamentally unfair in

25  light of witnesses' other testimony that defendant murdered her mother, stabbed her sister,

26  stabbed her, and then tried to burn down their house while the victims were still inside).  It is

27  improper for a prosecutor to question a defendant regarding the veracity of government

28  witnesses.  United States v. Moreland, 509 F.3d 1201, 1212 (9th Cir. 2007); see, e.g.,

1   United States v. Sanchez, 176 F.3d 1214, 1220-21, 1222, 1223-24 (9th Cir. 1999) (misconduct

2   where prosecutor elicited defendant's testimony that U.S. Marshal was a liar; witnesses' opinion

3   that defendant was a liar; other people's hearsay statements; and inadmissible evidence of prior

4   bad acts).  It should be noted, Moreland and Sanchez both involved direct appeals of federal

5   convictions and did not apply the highly deferential standard of review required by the AEDPA.

6          Respondent contends that the prosecutor's questions were not so unfair as to deprive

7   Petitioner of his right to due process.  Resp. Mem. at 10.  Additionally, Respondent points out

8   that the jury was presented with "overwhelming evidence of Petitioner's guilt."  Id.  This

9   evidence included the fact that Petitioner was arrested in a vehicle that matched the description of

10  the getaway car from the Roe robbery, that Petitioner possessed a puffy dark blue jacket similar

11  to the one worn by the robber, and an amount of money almost equal to the amount taken from

12  Roe, and that several of the robbery victims identified Petitioner at a photo lineup.  Id.

13         The state appellate court held that "the trial court's reading of [the cited] cases only to

14  preclude use of the word 'lying' was overly narrow."  Resp. Ex. C at 29.  The appellate court

15  concluded that "the prosecutor was overzealous when she used the word 'lying.'"  Id.  However,

16  the appellate court found that the trial court's admission of the prosecutor's questions was

17  harmless.  Id.  The court noted Petitioner's concession that a prosecutor is allowed to point out

18  inconsistencies between a defendant's testimony and a witness's testimony.  Id.  It observed that

19  the prosecutor did not "put before the jury anything she would not have been entitled to point out

20  during closing arguments."  Id.  Since the jury instructions provided that counsel's statements

21  were not evidence and that the jury should assess the credibility of witnesses in light of

22  conflicting testimony, the appellate court found it reasonable to conclude that the jury, not

23  Petitioner, would determine who was telling the truth.  Id.  Ultimately, the appellate court

24  concluded that although it did not condone the "prosecutor's cross-examination technique," the

25  error did not require reversal.  Id.

26         Applying the highly deferential standard of the AEDPA, this Court concludes that the

27  prosecutor's questioning did not result in a violation of due process.  While it may have been

28  inappropriate to ask Petitioner about his opinion regarding the veracity of the testimony of the

1   testimony of some witnesses, the prosecutor's conduct did not render the trial fundamentally

2   unfair.  The jury was properly instructed that it should not consider counsel's statements as

3   evidence.  Moreover,  Petitioner's response to the prosecutor's questioning was either to say that

4   he did not know whether a witness was lying, or to restate his own testimony.  The state court's

5   determination was not contrary to, or an unreasonable application of, clearly established Supreme

6   Court precedent, nor was it based on an unreasonable determination of the facts in light of the

7   evidence presented.  28 U.S.C. § 2254(d)(1),(2).

8           2.      The Trial Court's Admission of the Impeachment of Defense Witnesses Was Not
                    Erroneous
9

10          Next, Petitioner claims that the trial court erred in allowing the prosecution to impeach

11   his defense witnesses, Denise Hines and Latricia King, by introducing testimony of Petitioner's

12   past drug use and prior incident of domestic violence.  Petition at 6A.

13          On direct examination by Petitioner's defense counsel, Ms. Hines testified that she had

14   known Petitioner for seventeen years and that Petitioner was her fiancee and the father of her

15   son.  Resp. Ex. C at 10.  She also testified that Petitioner occasionally stayed with her, and that

16   she had helped Petitioner with his catering business around the time period when the robberies

17   occurred.  Id.  Ms. Hines further testified that during the times she knew Petitioner, she had only

18   seen him wearing a mustache and was never aware that he owned or wore a puffy blue hooded

19   jacket such as the one worn by the robber.  Id. at 10-11.  Similarly, Ms. King testified on direct

20   that she had helped Petitioner, her former boyfriend, start his catering business by selecting menu

21   items and designing flyers.  In an attempt to provide Petitioner with an alibi, she testified that

22   Petitioner had come to her home early in the morning on the day of the robbery in question, and

23   that he had spent a few hours there.  Id. at 20.

24          On cross-examination, the prosecutor questioned Ms. Hines about her romantic

25   relationship and financial dealings with Petitioner, to which Petitioner's defense counsel did not

26   object.  Resp. Ex. C at 11.  However, when the prosecutor began questioning Ms. Hines about

27   whether the "ups and downs" in her relationship with Petitioner were influenced by Petitioner's

28   drug abuse, defense counsel objected that the testimony was irrelevant.  Id.

1   At an ensuing conference in chambers, Petitioner's counsel further objected to questions going to

2   Petitioner's prior substance abuse because such questions would violate the trial court's in limine

3   ruling excluding evidence of Petitioner's drug conviction.  Id.  The trial court overruled the

4   objection, holding that Petitioner's history of drug abuse was relevant for purposes of

5   impeachment.  Id.  Subsequently, the trial court continued to allow the prosecution to cross-

6   examine Ms. Hines about Petitioner's history of substance abuse.  Id. at 12-15.

7         The prosecutor also cross-examined Ms. King at length about Petitioner's drug use and

8   about various acts of domestic violence that Petitioner allegedly committed against her.  Id. at

9   20-21.  Ms. King acknowledged that one of the reasons she broke up with Petitioner was

10  Petitioner's abuse of crack cocaine in 1997.  Later in the course of cross-examination, the

11  prosecution introduced evidence of a restraining order that Ms. King obtained against Petitioner

12  in 1997.  Id. at 21.  Petitioner's counsel objected to this line of questioning, but the court allowed

13  the evidence as relevant to whether Ms. King's testimony on direct examination, which was

14  favorable to Petitioner, was motivated by fear.  Id. at 21-22.  Ms. King explicitly denied any fear

15  of Petitioner and also stated that Petitioner had never physically abused her.  Id. at 22.  The

16  prosecution then introduced evidence of a prior incident in which Petitioner held a gun to Ms.

17  King's head, threatening to kill her if she did not give him money, and other incidents in which

18  Petitioner pushed Ms. King into a wall, held a knife to her throat, and held a hot iron to her face.

19  Id.

20        A state court's evidentiary ruling is not subject to federal habeas review unless the ruling

21  violates federal law, either by infringing upon a specific federal constitutional or statutory

22  provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.

23  See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20

24  (9th Cir. 1991); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S.

25  1021 (1986).  The admission of evidence is not subject to federal habeas review unless a specific

26  constitutional guarantee is violated or the error is of such magnitude that the result is a denial of

27  the fundamentally fair trial guarantee of due process.  See Henry v. Kernan, 197 F.3d 1021, 1031

28  (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.), cert. denied, 479 U.S. 839

1   (1986).  In order to obtain habeas relief on the basis of an evidentiary error, a petitioner must

2   show that the error was one of constitutional dimension and that it was not harmless under Brecht

3   v. Abrahamson, 507 U.S. 619 (1993).  He would have to show that the error had "'a substantial

4   and injurious effect on the verdict.'"  Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001)

5   (quoting Brecht, 507 U.S. at 623).

6          The appellate court rejected Petitioner's claim that the prosecution improperly cross-

7   examined Denise Hines at trial for impeachment purposes:

8          We accept (as did the trial court) appellant's characterization of
    Hines's direct testimony as not constituting evidence of general "good character."  We
9   therefore acknowledge that nothing in the direct entitled the prosecution to introduce
    general "bad character" evidence in response, whether through its cross-examination of
10  Hines or otherwise.  (Citation omitted).  Nonetheless, we cannot find an abuse of
    discretion in the trial judge's ruling allowing the prosecutor's cross-examination to test
11  Hines's knowledge of appellant's drug use during the course of her relationship with him,
    for two reasons.
12
           First, Hines's testimony that she had never known appellant to do certain things
13  (specifically, own a certain type of jacket or shave off his mustache) entitled the
    prosecution to seek to impeach Hines by testing the depth of her knowledge of his
14  behavior and habits during the 17 years she knew him.  (Citation omitted).  Second, the
    evident purpose of much of Hines's direct testimony was to bolster a key aspect of
15  appellant's defense, to wit, his contention that because he had a growing catering business
    and an inheritance, he had no need to obtain money illegally, and thus no motive for the
16  robberies.

17         The prosecution's cross-examination regarding Hines's knowledge
    of appellant's drug use was aimed at impeaching Hines on both of these points, by
18  "rebut[ting the] impressions left by [her] own testimony on direct," and thus was properly
    allowed.  (Citation omitted).  Moreover, in light of the fact that appellant had cocaine in
19  his possession when he was arrested had already come into evidence, we find no abuse of
    discretion in the trial court's determination that the probative value of this evidence for
20  impeachment outweighed its prejudicial effect.  (Citation omitted).

21         With respect to the recross-examination, our analysis must take into
    account the effect of appellant's trial counsel's having prompted Hines, on redirect, to
22  testify that the last time she knew appellant to have used crack cocaine was in 1991.  We
    concur with the trial judge's ruling that once appellant introduced this testimony, the state
23  of the evidence changed in a way that materially affected the basis for the in limine
    rulings excluding evidence of appellant's drug arrests.
24
           Appellant contends that the trial court's rulings rested on the theory
25  that Hines's testimony had "opened the door" or "opened the gates" for the admission of
    otherwise inadmissible evidence, and that this was error. . . .
26
           . . . .
27

28  ///

1         In this case, however, it is clear from the record that when the parties
and the trial judge used the term "opening the door" in reference to Hines's testimony,
2 what they meant by it was not curative admissibility, but specific contradiction.  Thus,
our analysis focuses on that theory.  Specific contradiction is a perfectly valid basis for
3 impeachment.  (Citations omitted).  Indeed, as the commentators remark, "recognizing
the entitlement to specific contradiction impeachment is essential to the proper
4 functioning of an effective adversary system of litigation." (Citation omitted).

5         Thus, we frame the issue differently.  The question is whether the
prosecutor's probing of Hines's knowledge of appellant's drug arrests between 1991 and
6 the date of trial was properly allowed on a specific contradiction theory in order to
impeach Hines's redirect testimony.  (Citation omitted).  The record makes clear that this
7 line of questioning was aimed at eliciting evidence that would specifically contradict
Hines's testimony that she was not aware of appellant's having used cocaine since 1991.

8     . . . .

9
10         In this case, on the other hand, Hines's redirect testimony was that to
her personal knowledge, appellant had not used cocaine since 1991.  The prosecutor was
entitled to impeach the credibility of that assertion on recross by asking her about facts
11 regarding appellant's drug arrests which, based on her account of her relationship with
appellant, she could reasonably be assumed to know, and which specifically contradicted
12 her testimony. (Citation omitted).

13         In short, given Hines's testimony on redirect, the prosecutor was
entitled to ask her, on recross, questions that were designed to impeach her on this
14 specific point.  Moreover, given Hines's prior testimony concerning her close association
with appellant during the time between 1991 and the date of trial, she could be expected
15 to have known when he was arrested during that time, and for what reason.  Questions on
this subject therefore constituted proper impeachment by specific contradiction of Hines's
16 redirect testimony, even if evidence of appellant's prior drug arrests was inadmissible
under Evidence Code section 1101. (Citations omitted).

17
Resp. Ex. C at 15-20.
18

19      The appellate court also rejected Petitioner's contention that the trial court erred in its

20 rulings with respect to the cross-examination of Ms. King:

21         [W]e concur with the trial court's decision to allow the prosecutor to question
King about whether she and appellant had problems during their dating relationship, and
22 if so, for what reasons.  Given King's direct testimony that appellant was her *ex*-
boyfriend, questions about the reasons for the termination of the relationship were clearly
23 within the scope of direct.  Appellant does not argue otherwise.  These questions were
also relevant, because of the obvious possibility that the answers would reveal a bias on
24 the part of the witness.  (Citation omitted).  Moreover, by that point it was already in
evidence that appellant had used cocaine during the late 1990s, had been in possession of
25 it when he was arrested, and had experienced problems in another dating relationship
(with Hines) because of it.  Thus, we see no abuse of discretion in the trial court's having
26 permitted the prosecutor to ask King whether her problems with appellant were related to
his cocaine use.  (Citations omitted).

27
        As for the domestic violence, the trial court's initial reason for allowing the
28 prosecutor to question King about the subject was King's testimony that she had spoken

1
2   with appellant by telephone on almost a daily basis during a period of time when there
    was a domestic violence restraining order in effect precluding personal or telephone
3   contact between appellant and King.  In our opinion, the trial court correctly ruled that the
    prosecutor was entitled to question King about the restraining order in order to impeach
4   her statements regarding the frequency of her telephone conversations with appellant
    during this period.  The existence of the restraining order, which was issued at King's
5   request, tended to directly contradict her testimony, and was therefore properly introduced
    to impeach it.

6           Thus, as underlined by the jury instruction appellant later requested and received
    (citation omitted), the evidence that King had taken out a domestic violence restraining
7   order against appellant was not admitted to prove his bad character or disposition to
    commit the charged offenses, as precluded by Evidence Code section 1101, but rather to
8   impeach King's testimony.  Moreover as is clear from our narrative of the sequence of
    King's testimony, the prosecutor's lines of questioning about specific incidents of
9   domestic violence were also relevant and admissible to impeach King's successive,
    volunteered statements about appellant: first, that she had not had a problem with him
10  after the restraining order was issued, and second, that he had never abused her
    physically.  The trial court correctly relied on a specific contradiction theory in allowing
11  this testimony.  (Footnote omitted).

12  Id. at 22-24.

13          The state appellate court distinguished the instant case from the cases Petitioner raised

14  and concluded: "In short, none of the arguments and authorities on which appellant relies

15  convinces us that the trial court erred in permitting the prosecutor to cross-examine King

16  regarding the abuse she suffered at appellant's hands.  Nor do we find that the prosecutor

17  committed misconduct."  Id. at 26.

18          This Court concludes that neither the trial court nor the state appellate court deprived

19  Petitioner of his fundamental rights to a fair trial and to due process.  See Pulley v. Harris, 465

20  U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991); Middleton v.

21  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986).  See also Henry

22  v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir.),

23  cert. denied, 479 U.S. 839 (1986) (standing for the proposition that the admission of evidence is

24  not subject to federal habeas review unless a specific constitutional guarantee is violated or if the

25  error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by

26  due process).  The admission of evidence of Petitioner's drug use and acts of domestic violence

27  for impeachment purposes was not an unreasonable application of clearly established federal law,

28  nor was it an unreasonable determination of the facts in light of the evidence presented.

1   28 U.S.C. § 2254(d)(1), (2).

2         Moreover, even if the admission of the impeachment testimony was an error of

3   constitutional magnitude, Petitioner has not demonstrated that the evidence introduced had a

4   substantial or injurious effect on the verdict.  Dillard, 244 F.3d at 767 n.7 (quoting Brecht, 507

5   U.S. at 623).  Any error of admission of Petitioner's prior bad acts was harmless because, as

6   Respondent points out, evidence of Petitioner's drug use also was offered by Sergeant Medeiros

7   and by Petitioner himself.  Resp. Ex B (Reporter's Transcript, "RT") at 1715-16, 2169; see Resp.

8   Mem. at 14.  Moreover, there was more than enough other evidence to permit an objective trier

9   of fact to find Petitioner guilty of three counts of robbery beyond a reasonable doubt.  As

10  Respondent pointed out:

11         Overwhelming evidence of petitioner's guilt was presented to the jury.  One of the
           victims positively identified petitioner as the robber within hours of the robbery, and
12         again positively identified petitioner at trial, as did the two other victims, one of whom
           also identified petitioner at a lineup several days after she had been robbed.  RT 1166-67.
13         Petitioner admitted to police he had robbed a "white woman" the day Dawn Roe was
           robbed, and was apprehended in the general area of the robbery, in a car which matched
14         the description of the "getaway" vehicle.  RT 1475, 1584-85, 1721-22.  In the car was a
           dark blue jacket similar to the one worn by the robber, as was over $200, or just under the
15         amount taken from Dawn Roe that day.  RT 1476-77, 1590-91, 1632.  Petitioner also
           admitted to three other robberies in the area where Bruce Babst and Emily Grimm were
16         robbed.  RT 1721-22. Resp. Mem. at 10.

17         Respondent also notes that the trial court instructed the jury on two occasions not to

18  consider evidence of Petitioner's bad acts as character evidence, and defense counsel reiterated

19  this point in closing argument.  Resp. Mem. at 10; RT 2526, 2736-37, 2884-85; Ex. C at 26.  For

20  all of the reasons discussed above, the state court's determination was not contrary to, or an

21  unreasonable application of, clearly established Supreme Court precedent, nor was it based on an

22  unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

23  2254(d)(1),(2).

24         3.    The Trial Court's Evidentiary Rulings Did Not Deny Petitioner The Opportunity
                 to Present a Complete Defense
25

26         Petitioner's principal defense at trial was that the robberies with which he was charged

27  were committed by someone else, and that the victims had misidentified him.  Resp. Ex. C at 29.

28  In support of his defense, Petitioner moved to admit three items of evidence:  (1) evidence of

1   another robbery (the robbery of Kathy Morris) committed, by someone other than Petitioner, in

2   the same area and during the same time period that Petitioner supposedly committed the charged

3   robberies; (2) evidence of the fingerprint of Emily Grimm, which Petitioner argued could

4   establish that a fingerprint taken from Ms. Grimm's driver's license immediately after the

5   robbery belonged to the "real" robber; and (3) evidence that Petitioner had a personal relationship

6   with a co-arrestee, Henry Lindsey, to show that the personal information that the police obtained

7   about Petitioner, purportedly from an interview with Petitioner, also could have been obtained

8   from Henry Lindsey, thus, bolstering Petitioner's claim that his alleged interview with the police

9   was a fabrication.  Resp. Ex. C. at 30.  The trial court, exercising its discretion, excluded the

10  evidence under California Evidence Code section 352.[16]  Petitioner contends that this ruling was

11  erroneous and deprived him of the opportunity to present a complete defense.  Petition at 6A.

12      Respondent contends that evidence of the Kathy Morris robbery would have permitted the

13  prosecutor to introduce evidence "of four uncharged robberies that also occurred in the same time

14  period, the same general area, and in a similar manner as the instant offenses."  Resp. Mem. at

15  16.  This would "have been highly prejudicial to Petitioner's case by linking him to a total of

16  nine robberies."  Id.  At a minimum, it would have required the victims of those robberies to

17  testify, thus, causing undue delay and confusion.  Id.  Respondent asserts that the fingerprint on

18  Ms. Grimm's license "was minimally probative."  Id.  Respondent claims that the print was kept

19  out in order to "keep the trial on track and focused on the instant charge."  Id.  Third, Respondent

20  argues excluding evidence that related to Henry Lindsey's statement to police "did not have a

21  'substantial and injurious effect' on the verdict."  Id.

22      The Sixth Amendment affords an accused in a criminal trial the right to present a defense.

23  Chambers v. Mississippi, 410 U.S. 284, 294 (1973).  The Due Process Clause "requires that

24  criminal prosecutions 'comport with prevailing notions of fundamental fairness' and that

25  'criminal defendants be afforded a meaningful opportunity to present a complete defense.'"

26  _____

27      [16]Cal. Evidence Code § 352 states:  "The court in its discretion may exclude evidence if
    its probative value is substantially outweighed by the probability that its admission will (a)

28  necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of
    confusing the issues, or of misleading the jury."

1    Clark v. Brown, 450 F.3d 898, 904 (9th Cir. 2006) (quoting California v. Trombetta, 467 U.S.

2    479, 485 (1984)).

3          The Supreme Court has made clear that the erroneous exclusion of critical, corroborative

4    defense evidence may violate the Sixth Amendment right to present a defense, as well as the due

5    process right to a fair trial.  DePetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing

6    Chambers, 410 U.S. at 294, and Washington v. Texas, 388 U.S. 14, 18-19 (1967)); see, e.g.,

7    United States v. Sandoval-Mendoza, 472 F.3d 645, 655-56 (9th Cir. 2006) (direct review; where

8    credible, qualified medical experts disagreed about whether the defendant's medical condition

9    made him susceptible to suggestion, the trial court's exclusion of the expert witnesses'

10   conflicting testimony deprived the defendant of his right to present an entrapment defense,

11   warranting a new trial); United States v. Boulware, 384 F.3d 794, 808-09 (9th Cir. 2004) (direct

12   review; exclusion of a state court judgment that directly supported defense to the tax charges and

13   directly contradicted the government's theory of the case that defendant had stolen money from

14   his closely-held corporation and gifted it to his girlfriend violated defendant's due process right

15   to present a defense and error was not harmless beyond a reasonable doubt).  However, while this

16   right is well established, it does not preclude discretionary limitations on presentations of defense

17   witnesses by the trial court where, for example, a witness has invoked the Fifth Amendment.  See

18   e.g., Arredondo v. Ortiz, 365 F.3d 778, 783-84 (9th Cir. 2004) (upholding trial court's exclusion

19   of defense witness who intended to invoke the Fifth Amendment).

20         However, even if the trial court did err by excluding the evidence at issue here, Petitioner

21   can obtain federal habeas relief only if the error violated his constitutional rights and had a

22   "substantial and injurious effect on the verdict."  Brecht, 507 U.S. at 619; Dillard, 244 F.3d 758

23   at 767 n.7.  The state appellate court rejected Petitioner's claim as follows:

24              Evidence of third-party culpability, like other evidence, is admissible unless its
            probative value is outweighed by the risk of undue delay, prejudice, or confusion, thus
25          warranting its exclusion under Evidence Code section 352.  (Citation omitted).  In this
            case, the prosecution argued persuasively that if appellant was permitted to introduce
26          evidence of the Morris robbery, then it should be permitted, in rebuttal, to admit evidence
            of additional similar robberies that occurred in the Rockridge area at about the same time,
27          in which the victims' descriptions of the robber bore a strong resemblance to appellant.
            We concur with the trial court's exercise of its discretion under section 352 to exclude all
28          of the evidence of other similar robberies, including that offered by appellant.  Its

probative value was minimal, and introducing it would have entailed significant delay, prejudice, and confusion.

Similarly, the exculpatory effect of proving that the fingerprint on Grimm's driver's license belonged to a third party would also have been minimal. Appellant contends that obtaining and admitting this evidence would have allowed him to argue to the jury that the fingerprint belonged to the perpetrator of the robbery, who therefore must have been someone other than appellant. It had already been established, however, that the print did not belong to appellant, which had far more exculpatory weight than proving that it also did not belong to Grimm. Indeed, Grimm testified that other people frequently handled her license for totally innocent reasons. Thus, proving that the fingerprint belonged not to Grimm but to a third party would have added little if any weight to appellant's contention that some person other than himself was the robber. The trial court did not abuse its discretion in denying appellant's request. Taking a fingerprint from Grimm, and having an expert testify regarding its comparison with the print on the license, would have consumed far more time than was warranted by the potential probative value of such evidence.

Finally, we find no reversible error in the exclusion of appellant's proffered testimony about his disclosure of personal information to Lindsey. We accept appellant's argument, which respondent does not seriously contest, that the testimony was not hearsay, the sole ground asserted and sustained for its exclusion. It was not offered to prove the truth of its contents, but only to establish a possible alternative source for information that the police contended was obtained from their post-arrest interview of appellant.

The error was harmless, however. As the trial court pointed out, if appellant had testified as to what he told Lindsey, for the purpose of arguing that Lindsey passed it along to Medeiros, the prosecution would have been entitled to rebut this evidence by introducing the content of Lindsey's statement to the police. Given that appellant had successfully argued that Lindsey's statement should be excluded on hearsay grounds, we assume its contents were not helpful to appellant's case, and would not have corroborated his contention that the police had actually gotten their information about appellant from Lindsey rather than from appellant. Even setting aside this speculation, the fact remains that appellant's contention was extremely unpersuasive, given the extent and nature of the information that Medeiros testified he had learned from his interview of appellant. Thus, the probative value of the proffered defense evidence was so minimal that its exclusion has not been shown to have prejudiced appellant.

Resp. Ex. C at 30-31.

The state appellate court's analysis was not unreasonable. As the court held, the trial court did not abuse its discretion in concluding that the admission of the evidence would be of minimal probative value, entail significant delay in the trial, potentially prejudice Petitioner's defense, and confuse the jury. Accordingly, exclusion of this evidence was proper and within the trial court's discretion under California Evidence Code 352. Because as noted earlier, there was a wealth of evidence linking Petitioner to the three charged robberies, any error was harmless. Therefore, the state appellate court's determination was not contrary to, or an unreasonable

1  application of, federal law or Supreme Court precedent; nor did it result in a decision based on an

2  unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. §

3  2245(d)(1), (2).

4          4.      The Trial Court's Cumulative Evidentiary Rulings Did Not Render the Trial
                   Fundamentally Unfair

5

6          Petitioner next claims that his trial was rendered fundamentally unfair by the cumulative

7  effect of the rulings discussed above.  Petition at 6A.  Even if no single trial error is sufficiently

8  prejudicial to warrant reversal, the cumulative effect of several errors may prejudice a defendant

9  so much that his conviction must be overturned.  Alcala v. Woodford, 334 F.3d 862, 893-95 (9th

10 Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts

11 to challenge every important element of proof offered by prosecution).  However, where no

12 single constitutional error exists, nothing can accumulate to the level of a constitutional violation.

13 Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); Rupe v. Wood, 93 F.3d 1434, 1445 (9th

14 Cir. 1996).  Moreover, cumulative error is more likely to be found prejudicial when the

15 government's case is weak.  Walker v. Engle, 703 F.2d 959, 961-62, 968 (6th Cir.), cert. denied,

16 464 U.S. 951 (1983).

17         The state appellate court rejected Petitioner's claim of cumulative error as follows:

18         "Appellant also argues that even if each of the asserted evidentiary errors was harmless in
           and of itself, their cumulative effect was to deny him a fair trial.  We have rejected all but
19         two of appellant's claims of evidentiary error, and have found the two that remain to have
           been harmless when considered separately.  We likewise find them harmless even when
20         considered cumulatively."  Ex. C at 31, fn. 26.

21         This Court agrees with the state appellate court that the cumulative effect of the trial

22 court's evidentiary rulings did not render Petitioner's trial fundamentally unfair.  Because the two

23 erroneous evidentiary rulings by the trial court were harmless, the cumulative effect of the trial

24 court's evidentiary rulings could not amount to cumulative error.  As has been noted previously,

25 the evidence against Petitioner was strong.  Accordingly, the state court's determination was not

26 contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor

27 was it based on an unreasonable determination of the facts in light of the evidence presented.  28

28 U.S.C. § 2254(d)(1),(2).

1        5.     The Trial Court's Denial of Petitioner's Severance Motion Was Not Error

2        Petitioner alleges that the trial court erred in denying his motion to sever the robbery

3   counts from one another.  Petition at 6A.  A joinder, or denial of severance, of co-defendants or

4   counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation

5   of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997); Herd v. Kincheloe, 800

6   F.2d 1526, 1529 (9th Cir. 1986).  However, a federal court reviewing a state conviction under 28

7   U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.

8   Grisby, 130 F.3d at 370.  Nor is it concerned with the procedural rights to severance afforded in

9   federal trials.  Id.  Its inquiry is limited to the petitioner's right to a fair trial under the United

10  States Constitution.  To prevail, a petitioner must demonstrate that the state court's joinder or

11  denial of his severance motion resulted in prejudice great enough to render his trial

12  fundamentally unfair.  Id.  In addition, the impermissible joinder must have had a substantial and

13  injurious effect or influence in determining the jury's verdict.  Sandoval v. Calderon, 241 F.3d

14  765, 772 (9th Cir. 2000).

15       The state appellate court rejected Petitioner's improper severance argument as follows:

16           It is evident from the record that the trial judge in this case gave careful
             consideration to the issues raised by the motion, and was well-versed in the applicable
17           law.  For the reasons explained below, we conclude that the trial judge properly exercised
             his discretion in denying the motion.

18
             . . .
19
             [T]he trial judge in this case began his analysis of the severance motion by
20           determining whether the evidence of the various robberies would be cross-admissible if
             they were tried separately, applying the tests discussed in *People v. Ewoldt* (1994) 7
21           Cal.4th 380, 402-403 (*Ewoldt*) for cross-admissibility under Evidence Code section 1101.
             The prosecution here contended that the evidence would be cross-admissible on either of
22           two grounds:  to show that each robbery was part of a common design or plan by
             appellant, or to show identity, i.e., to prove that appellant was in fact the person who
23           committed each robbery.

24           In *Ewoldt*, the Supreme Court explained that when evidence of other crimes is
             admitted to show a common design or plan, the purpose must be to show that the
25           defendant's actions were consistent with those charged.  "Evidence of a common design
             or plan is admissible to establish that the defendant committed the *act* alleged.  Unlike
26           evidence used to prove intent, where the act is conceded or assumed, '[i]n proving design,
             the act is still undetermined . . . .' [Citation].  For example, in a prosecution for
27           shoplifting in which it was conceded or assumed that the defendant was present at the
             scene of the alleged theft, evidence that the defendant had committed uncharged acts of
28           shoplifting in a markedly similar manner to the charged offense might be admitted to

1

demonstrate that he or she took the merchandise in the manner alleged by the prosecution." (Citation omitted).

2

3

Based on this analysis, the *Ewoldt* court noted that other crimes evidence will not be admissible to show common design "in most prosecutions for crimes such as burglary and robbery," because in such cases, "it is beyond dispute that the charged offense was committed by someone, [and] the primary issue to be determined is whether the defendant was the perpetrator of that crime. Thus, in such circumstances, evidence that the defendant committed uncharged offenses that were sufficiently similar to the charged offense to demonstrate a common design or plan (but not sufficiently distinctive to establish identity) ordinarily would be inadmissible. Although such evidence is relevant to demonstrate that, assuming the defendant was present at the scene of the crime, the defendant engaged in the conduct alleged to constitute the charged offense, if it is beyond dispute that the alleged crime occurred, such evidence would be merely cumulative and the prejudicial effect of the evidence of uncharged acts would outweigh its probative value." (Citation omitted). In light of this discussion, which is on all fours with the present case, the trial judge correctly rejected the prosecution's contention that the evidence would be cross-admissible to show a common design or plan, and held that it could only come in on the issue of identity.

4

5

6

7

8

9

10

11

On that issue, the trial judge duly noted the *Ewoldt* court's admonition that "[t]he greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (Citation omitted).

12

13

14

15

Even under this strict test, the trial judge found the robberies charged here sufficiently similar and distinctive to make them cross-admissible. He relied on the following factors: the robberies all occurred within a few blocks of one another during a five-day period (with two incidents on the same day); the perpetrator was over six feet tall, wore a distinctive blue hooded jacket, and kept at least one hand in his pocket in a way that made it look as if he had a gun; and in each case, the robber approached on foot a White female who was (or appeared to be) (footnote omitted) alone on the street, demanding only the victim's cash. Given all of these common factors, we concur in the trial judge's assessment that it is extremely improbable that these robberies could have been committed by different individuals. Thus, we can find no abuse of discretion in his conclusion that the crimes with which appellant was charged were sufficiently similar, and sufficiently distinctive, to meet the standard articulated in *Ewoldt* for cross-admissibility on the issue of identity.

16

17

18

19

20

21

22

Because the evidence would have been cross-admissible to prove identity, if the motion to sever had been granted, each of the juries would have heard the evidence of all three robbery incidents. Thus, even if we were to accept appellant's contention that the evidence of his culpability was materially stronger in the Roe robbery that in the other two incidents, we still would find no prejudice from trying the offenses together.

23

24

25

Our review of the severance issue could stop there. (Citation omitted) Nonetheless, we have also considered the alternative ground that the trial judge gave for his ruling, rejecting appellant's contention that the quantum of evidence in the three incidents was so different that a joint trial would result in a prejudicial "spillover effect." We agree.

26

27

28

///

1
2
3
4
5
6

Although there was a higher quantum of *circumstantial* evidence corroborating appellant's identification as the perpetrator of the Roe robbery, the *overall* strength of the evidence that appellant committed the Grimm/Babst robberies was very nearly equal, given Grimm and Babst's highly confident, mutually corroborating identifications of appellant as the man who robbed them.  Thus, at least as to these three counts, appellant was not prejudiced by any "spillover" effect. (Citation omitted).  Appellant argues that the evidence on the Angel robbery was significantly weaker, but this does not alter our conclusion, because the jury was unable to reach a verdict on that count.  This fact in and of itself indicates that the jury properly carried out its duty to weigh the evidence on each count separately, and further negates any claim of prejudice from the denial of the motion to sever.  (Citation omitted).

7
8
9
10
11
12

For the reasons set forth by the state appellate court, this Court concludes that the denial of Petitioner's severance motion did not result in prejudice "great enough to render Petitioner's trial fundamentally unfair."  See Grisby, 130 F.3d at 370.  The state appellate court reasonably applied California law on improper joinder and severance of criminal counts under the standard set out in Ewoldt.  The evidence and circumstances surrounding the instant robberies were sufficiently similar to allow them to be cross-admissible to prove the identity of the perpetrator.

13
14
15
16
17
18

Moreover, even assuming that it was error to deny Petitioner's severance motion, Petitioner has not shown that the purported error had a substantial and injurious effect on the jury's verdict.  Sandoval, 241 F.3d at 772.  Accordingly, the state appellate court's determination was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1), (2).

19
20

       6.      The Trial Court's Denial of Petitioner's Motion for a Mistrial Did not Violate Petitioner's Due Process Right to a Fair Trial

21
22
23
24
25
26

Petitioner claims that his due process rights were violated by the trial court's denial of his motion for a mistrial.  Petition at 6A.  Petitioner moved for a mistrial during his case-in-chief based on the publication of a newspaper article earlier that day.  The newspaper article allegedly contained information prejudicial to Petitioner.  RT 2264-79; 2343; 2351-58.  This included: (1) information that Petitioner was a registered sex offender with a criminal history; (2) that police believed Petitioner was responsible for several other robberies in North Oakland; and (3) that the

27
28

1  prosecutor had said that she believed Petitioner was responsible for a series of other robberies.[17]

2  See id.  The trial court questioned the jurors to determine if they had seen or read the newspaper

3  article, and all denied having read or seen the article.  RT 2356-57.  The court reiterated the

4  instruction it had given the jury repeatedly throughout the trial–that the jury was not to consider

5  any such information in the context of the trial and denied Petitioner's motion for a mistrial.  RT

6  2351-58.

7         As Respondent points out, the trial court made an explicit factual finding that none of the

8  jurors in Petitioner's trial proceeding were exposed to the prejudicial information contained in

9  the newspaper article.  Resp. Mem. at 22; RT 2357.  Under 28 U.S.C. § 2254(e)(1), "a

10  determination of a factual issue made by a State court shall be presumed to be correct.  The

11  applicant [for habeas relief] shall have the burden of rebutting the presumption of correctness by

12  clear and convincing evidence."  Petitioner has submitted copies of newspaper article(s) to the

13  Court with his supplemental traverse.  Pet's. Supplemental Traverse at 10-12, Ex. B.  However,

14  Petitioner has not shown that the submitted articles are the same as those that were the subject of

15  his mistrial motion, nor has he produced any evidence showing that the jury in fact was exposed

16  to them.  Petitioner, therefore, has not rebutted the "presumption of correctness" to which the

17  trial court's factual determinations are entitled.

18         The state superior court's denial of Petitioner's motion for a mistrial, based on the

19  absence of evidence that the newspaper article(s) actually had a prejudicial effect on the jury, did

20  not render Petitioner's trial "fundamentally unfair."  Jammal, 926 F.2d at 919.  Accordingly, the

21  state court's determination was not contrary to, or an unreasonable application of, clearly

22  established Supreme Court precedent, nor was it based on an unreasonable determination of the

23  facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1),(2).

24  ///

25  ///

26

27         [17]The prosecutor informed the trial court that the reporter who wrote the article had asked

28  her about Petitioner's case.  With the exception of providing the reporter with an estimated time
    line, the prosecutor did not answer the reporter's other questions.  RT 2265-66.

1

7.     The Alleged Destruction of Evidence Did Not Violate Petitioner's Right to Due
Process

2

3       Petitioner claims that $208 in cash improperly was released to victim Emily Roe.

4  Petition at 6B.  Petitioner was arrested with $208 in cash shortly after the Roe robbery.  Ex. C at

5  7.  Roe was robbed of $208.  Id. at 6.  The bills in Roe's possession at the time of the robbery and

6  the bills in Petitioner's possession at the time of his arrest were of the exact same denominations.

7  Id. at 6-7.  Petitioner contends that the money should have been tested for fingerprints, and that if

8  none of Roe's fingerprints were found on the money it could not have belonged to her.  Traverse

9  at 23-25.  This evidence would have "negated her identification of Petitioner as the robber."  Id.

10  Petitioner asserts that he made a timely request that the money be tested for fingerprints, but that

11  it never was tested.  Id.  Petitioner also claims that a failure to make a timely request for testing

12  of evidence has no bearing on the exculpatory value of the evidence.  Id.  Finally, Petitioner

13  contends that Officer Medeiros acted in bad faith when he returned the money to Roe.  Id. at 25.

14       The government has a duty to preserve material evidence, i.e., evidence whose

15  exculpatory value was apparent before it was destroyed and that is of such a nature that the

16  defendant cannot obtain comparable evidence by other reasonably available means.  See

17  California v. Trombetta, 467 U.S. 479, 489 (1984); Grisby v. Blodgett, 130 F.3d at 371.

18  Although the good or bad faith of the police is irrelevant to the analysis when the police destroy

19  materially exculpatory evidence, the analysis is different if the evidence is only potentially

20  useful; in that case, there is no due process violation unless there is bad faith conduct by the

21  police in failing to preserve evidence.  Illinois v. Fisher, 540 U.S. 544, 547-48 (2004); Arizona v.

22  Youngblood, 488 U.S. 51, 58 (1988); Villafuerte v. Stewart, 111 F.3d 616, 625 (9th Cir. 1997);

23  see, Fisher, 540 U.S. at 547-48 (no bad faith failure to preserve substance seized from defendant

24  which had been tested four times and determined to be cocaine – the substance was only

25  potentially useful evidence because defendant at most could hope that he could conduct another

26  test that might show the substance not to be cocaine); United States v. Estrada, 453 F.3d 1208,

27  1212-13 (9th Cir. 2006) (no bad faith in part because there was no evidence of "malicious intent"

28  by government); United States v. Martinez-Martinez, 369 F.3d 1076, 1087 (9th Cir. 2004)

1  (no bad faith failure to take blood or urine samples at time of defendant's arrest where it was not

2  readily apparent that samples might have proven exculpatory for immigration crime).

3      Negligent failure to preserve potentially useful evidence is not enough to establish bad

4  faith and does not constitute a violation of due process. Grisby, 130 F.3d at 371. The existence

5  of a pending discovery request does not eliminate the necessity of showing bad faith on the part

6  of police officers who destroy potentially useful evidence. Illinois v. Fisher, 540 U.S. at 547-48.

7  Nor does the fact that the potentially useful evidence is central to the prosecution's case or the

8  defendant's defense eliminate the necessity of showing bad faith. Id. at 549.

9      Respondent argues that Petitioner "must first show that the evidence [is] material" before

10  its destruction can be determined to be a due process violation. Resp. Mem. at 22. In the

11  alternative, Respondent maintains that a failure to preserve potentially exculpatory evidence

12  amounts to a due process violation only if the failure was motivated by bad faith. Id.

13  Respondent contends, however, that even if the money had been tested and Roe's fingerprints

14  had not been found, that fact would not indicate that Roe had not handled the money.

15  Respondent notes that Petitioner did not make any request to have the money tested "during the

16  'significant period of time'" that it was in police custody. Id. at 23. Finally, Respondent

17  contends that the police did not act in bad faith by waiting nine months before turning it over to

18  the rightful owner. Id.

19      This Court concludes that the return of the money to Roe did not result in any violation of

20  Petitioner's right to due process. The money was not material to Petitioner's case, because the

21  absence of Roe's fingerprints would not have been sufficient in and of itself to establish that the

22  money did not belong to her, and thus it could not cast doubt on Roe's identification of Petitioner

23  as the perpetrator. In addition, Petitioner failed to show that the police acted in bad faith when

24  they waited nine months before returning the money to the victim. Petitioner's claim that he

25  made a request for the money to be tested immediately upon his arrest is supported only by an

26  affidavit attached to his traverse and does not appear in the trial record. Accordingly, the state

27  court's determination was not contrary to, or an unreasonable application of, clearly established

28  Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light

1    of the evidence presented.  28 U.S.C. § 2254(d)(1),(2).

2            8.    <u>Petitioner's Right to Due Process Was Not Violated By the State Court's
                  Rejection of His *Brady* Claim</u>.
3

4            Petitioner claims that the prosecutor committed <u>Brady</u>[18] error by failing to produce police

5    reports regarding other similar robberies in the same area.  Petition at 6B.  Petitioner contends

6    that because he was not identified by the victims as the perpetrator of those robberies, which

7    were similar in many respects to the charged offenses, this evidence would have supported his

8    "mistaken identity" defense, i.e., that a third-party committed the offenses with which he was

9    charged.  Traverse at 25-26.  Petitioner maintains that the prosecutor suppressed materially

10   exculpatory evidence, thereby violating his right to due process.  <u>Id.</u>

11           In <u>Brady v. Maryland</u>, 373 U.S. at 87 (1963), the Supreme Court held that "the

12   suppression by the prosecution of evidence favorable to an accused upon request violates due

13   process where the evidence is material either to guilt or to punishment, irrespective of the good

14   faith or bad faith of the prosecution."  The Supreme Court since has made clear that the duty to

15   disclose such evidence applies even when there has been no request by the accused, <u>United States</u>

16   <u>v. Agurs</u>, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well

17   as exculpatory evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).  Evidence is

18   material "if there is a reasonable probability that, had the evidence been disclosed to the defense,

19   the result of the proceeding would have been different.  A 'reasonable probability' is a

20   probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 682.

21           "There are three components of a true <u>Brady</u> violation: the evidence at issue must be

22   favorable to the accused, either because it is exculpatory, or because it is impeaching; the

23   evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

24   must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  The evidence need not be

25   sufficient to prove affirmatively that the defendant is innocent; it need only be favorable and

26   material.  <u>Gantt v. Roe</u>, 389 F.3d 908, 912 (9th Cir. 2004).  Moreover, good faith or inadvertence

27

28
_____
     [18] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

1   does not excuse the prosecutor's duty; whether non-disclosure was negligent or by design, it is

2   the responsibility of the prosecutor.  Giglio v. United States, 405 U.S. 150, 154 (1972).  That the

3   defense failed to discover favorable evidence when it could or should have done so does not

4   mean that such evidence has not been "suppressed."  Gantt, 389 F.3d at 912-13.  Impeachment

5   evidence is exculpatory within the meaning of Brady.  Giglio, 405 U.S. at 154; See also Bagley,

6   473 U.S. at 676.

7       However, a defendant cannot claim a Brady violation if he was "'aware of the essential

8   facts enabling him to take advantage of any exculpatory evidence.'"  United States v. Shaffer,

9   789 F.2d 682, 690 (9th Cir. 1986) (quoting United States v. Brown, 582 F.2d 197, 200 (2d Cir.),

10  cert. denied, 439 U.S. 915 (1978)); see, e.g., United States v. Bracy, 67 F.3d 1421, 1428-29 (9th

11  Cir. 1995) (where government discloses all information necessary for defense to discover alleged

12  Brady material on its own, government is not guilty of suppressing evidence); United States v.

13  Dupuy, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985).  However, the availability of particular

14  statements through the defendant himself does not negate the government's duty to disclose.

15  United States v. Howell, 231 F.3d 615, 625 (9th Cir. 2000).  "Defendants often mistrust their

16  counsel, and even defendants who cooperate with counsel cannot always remember all of the

17  relevant facts or realize the legal importance of certain occurrences."  Id. (citing United States v.

18  McElroy, 697 F.2d 459, 465 (2d Cir. 1982)).  "'Consequently, defense counsel is entitled to plan

19  his trial strategy on the basis of full disclosure by the government, regardless of the defendant's

20  knowledge or memory of the disclosed statements.'"  Howell, 231 F.3d at 625 (quoting McElroy,

21  697 F.2d at 465).

22      Respondent argues that "there is no indication that the evidence at issue - police reports

23  and statements by the victims of the other robberies - was exculpatory."  Resp. Mem. at 23-24.

24  Respondent points out that the state trial and appellate courts found that the probative value of

25  this evidence was minimal because the perpetrator of the other robberies was never identified.

26  Id. at 24; Ex. C at 29-31.  Respondent also contends that there is no evidence that the prosecution

27  suppressed this evidence, because "defense counsel indicated that the prosecution had fully

28  complied with his request for discovery."  Id. (citing to RT at 22-23).  "Also, in connection with

1    the prosecution's motion to admit evidence... the court and counsel discussed the uncharged

2    robberies, including the names of the victims involved.  Thus, Petitioner was completely aware

3    of the information he now claims the prosecution withheld, and [he] was presumably able to

4    conduct his own investigation into its relevance to his case."  Id. (citing to RT at 114-119).

5    Finally, Respondent argues that there was no prejudice because the trial court found the evidence

6    inadmissible under California Evidence Code section 352 because of its minimal probative value.

7    Ex. C at 29-30.  The state appellate court "concurr[ed] with the trial court's exercise of its

8    discretion under section 352 to exclude all of the evidence of other similar robberies."  Id. at 30.

9    The appellate court reasoned that the probative value of the evidence was minimal, "and

10   introducing it would have entailed significant delay, prejudice, and confusion."  Id.

11          This Court concludes that the state court's rejection of Petitioner's Brady claim was not

12   unreasonable.  First, as the state trial and appellate courts concluded, the probative value of the

13   evidence was minimal, and its introduction would have resulted in prejudice, undue delay, and

14   confusion of the issues.  If Petitioner had introduced evidence related to the Kathy Morris

15   robbery, thus bolstering his third-party culpability defense, that would have resulted in the

16   introduction by the prosecutor of evidence linking Petitioner with four other robberies, a

17   circumstance that would have prejudiced Petitioner's case while being minimally probative of his

18   alleged innocence.  Second, the evidence concerning the other robberies was not suppressed,

19   because Petitioner and his trial counsel knew about the other robberies, and defense counsel

20   stipulated that the prosecution had complied with his discovery request.  RT at 23.  The trial

21   court and defense counsel discussed the other robberies, including the names of the victims, on

22   the record.  Id.  Accordingly, this Court concludes that the state court's determination was not

23   contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor

24   was it based on an unreasonable determination of the facts in light of the evidence presented.  28

25   U.S.C. § 2254(d)(1),(2).

26   ///

27   ///

28   ///

1      9.     The Trial Court's Denial of Petitioner's *Miranda* Motion Did Not Result In Any
              Due Process Violation.
2

3         Petitioner claims that the state court's denial of his <u>Miranda</u>[19] motion was objectively

4   unreasonable.  Petition at 6B.  Petitioner alleges that Officer Medeiros never read him his rights

5   and that he never made a statement to Officer Medeiros; instead, he claims that Officer Medeiros

6   fabricated Petitioner's statement during his testimony at trial.  <u>Id.</u>  Petitioner also claims that his

7   due process rights were violated because his interrogation by the police was not electronically

8   recorded.  <u>Id.</u>

9         In <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Supreme Court held that certain

10  warnings must be given before a suspect's statement made during custodial interrogation can be

11  admitted into evidence.  <u>Miranda</u> announced a constitutional rule that cannot be superseded

12  legislatively.  <u>Dickerson v. United States</u>, 530 U.S. 428, 431-32 (2000).  <u>Miranda</u> and its progeny

13  govern the admissibility of statements made during custodial interrogation in both state and

14  federal courts.  <u>Id.</u> at 443-45.  However, general "on-the-scene questioning" concerning the facts

15  and circumstances surrounding a crime or other general questioning of citizens during the fact-

16  finding process do not trigger <u>Miranda</u> warnings.  <u>Id.</u> at 477-78.  If a suspect indicates in any

17  manner during questioning that he wishes to remain silent, interrogation must cease and any

18  statement obtained thereafter is considered the product of compulsion.  <u>Id.</u> at 473-74.

19        A person may waive his or her <u>Miranda</u> rights.  Whether such a waiver is valid depends

20  upon the totality of the circumstances, including the background, experience and conduct of the

21  defendant.  <u>United States v. Bernard S.</u>, 795 F.2d 749, 751 (9th Cir. 1986).  The government

22  must prove waiver by a preponderance of the evidence.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157,

23  168-69 (1986); <u>Lego v. Twomey</u>, 404 U.S. 477, 488-89 (1972); <u>Terrovona v. Kincheloe</u>, 912

24  F.2d 1176, 1180 (9th Cir. 1990).[20]  The waiver need not be express as long as the totality of the

25

26        [19]   <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

27        [20]To solicit a waiver of <u>Miranda</u> rights, a police officer need neither use a waiver form nor
28  ask explicitly whether the defendant intends to waive his rights.  <u>See</u> <u>Terrovona</u>, 912 F.2d at
    1179.

1  circumstances indicate that the waiver was knowing and voluntary.  North Carolina v. Butler,

2  441 U.S. 369, 374 (1979).

3       There is a presumption against waiver.  United States v. Garibay, 143 F.3d 534, 536 (9th

4  Cir. 1998).  To satisfy its burden, the government must introduce sufficient evidence to establish

5  that under the totality of the circumstances, the defendant was aware of "the nature of the right

6  being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475

7  U.S. 412, 421 (1986).  A showing that the defendant knew his rights generally is sufficient to

8  establish that he knowingly and intelligently waived them.  See, e.g., Paulino v. Castro, 371 F.3d

9  1083, 1086-87 (9th Cir. 2004) (statement that suspect understood his rights and wanted to talk to

10  officer sufficient to waive right to counsel).

11       Although the burden is on the government to prove voluntariness, a waiver cannot be

12  held involuntary absent official compulsion or coercion.  See Colorado v. Connelly, 479 U.S.

13  157, 170 (1986).  There is no constitutional requirement that a police interrogation be

14  electronically or stenographically recorded.  United States v. Coades, 549 F.2d 1303, 1305 (9th

15  Cir. 1977).  Habeas relief should be granted where the admission of statements in violation of

16  Miranda "'had a substantial and injurious effect or influence in determining the jury's verdict.'"

17  Jackson v. Giurbino, 364 F.3d 1002, 1010 (9th Cir. 2004) (granting habeas relief where evidence

18  was admitted against petitioner in patent violation of Miranda and he suffered "substantial

19  prejudice" as a result) (quoting Calderon v. Coleman, 525 U.S. 141, 147 (1998)).

20       Officer Medeiros testified that he read Petitioner his Miranda rights, RT at 8-12, and that

21  Petitioner thereafter "informed Sergeant Medeiros he wanted to talk with him." Id.; RT at 12.

22  Petitioner then admitted his involvement in the four robberies. Id. at 14.  However, "at some

23  point during the interview... [P]etitioner invoked his right to remain silent."  Resp. Mem. at 25.

24  As a result, Officer Medeiros ended the interview and "noted on a standard form that an official

25  statement was not taken."  RT at 22.  Respondent suggests "that Petitioner's [Miranda] claim is

26  based on his refusal to give a written, or 'official' statement to police."  Resp. Mem. at 25.

27       This Court concludes that the trial court's ruling did not violate Petitioner's right to due

28  process.  As noted above, there is no federal constitutional right to have a police interrogation

1    electronically recorded.  Coades, 549 F.2d at 1305.   In light of the highly deferential standard of

2    review applicable to the instant proceedings, Petitioner has failed to rebut the underlying facts in

3    the record that support the trial court's finding that Petitioner in fact was read his Miranda rights,

4    and that he did make the statements at issue to Officer Medeiros.  Accordingly, the state court's

5    determination was not contrary to, or an unreasonable application of, clearly established Supreme

6    Court precedent, nor was it based on an unreasonable determination of the facts in light of the

7    evidence presented.  28 U.S.C. § 2254(d)(1),(2).

8           10.    Petitioner Was Not Prejudiced by the Admission of the Out-of-Court
                   Identification
9

10          Finally, Petitioner states that denying him counsel at the police line-up violated his right

11   to due process.  Petition at 6B.  A defendant has a right to counsel at a post-indictment lineup

12   because it is a critical stage of the prosecution.  See United States v. Wade, 388 U.S. 218, 236-37

13   (1967).  Counsel is not required at pre-indictment lineups, however, because the right to counsel

14   does not attach until adversary judicial proceedings have been initiated against a defendant.  See

15   Kirby v. Illinois, 406 U.S. 682, 688-91 (1972).  At trial, Sergeant Medeiros testified that

16   Petitioner was merely a suspect at the time of the lineup and had not been charged with any

17   offenses.  RT at 19.  Thus, under Kirby, Petitioner was not entitled to counsel at the lineup

18   because he had not yet been charged with a crime.  Kirby, 406 U.S. at 688-91.  Accordingly, the

19   state court's determination was not contrary to, or an unreasonable application of, clearly

20   established Supreme Court precedent, nor was it based on an unreasonable determination of the

21   facts in light of the evidence presented.  28 U.S.C. § 2254(d)(1),(2).

22                                 **III. CONCLUSION**

23          This Court concludes that Petitioner has failed to show any violation of his federal

24   constitutional rights in the underlying state court proceedings.  Accordingly, the petition for a

25   writ of habeas corpus is DENIED.  The Clerk shall enter judgment and close the file.

26          IT IS SO ORDERED.

27   DATED: ___4/21/08_____                    _____

28                                                   JEREMY FOGEL
                                                     United States District Judge